## AFFIDAVIT

I, Nicholas Nimeskern, a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), being duly sworn, depose and state as follows:

1.     I am a TFO with DEA in the Cincinnati Resident Office (RO) and have been since 2020. I have been a police officer since 2005 and am currently employed with the City of Montgomery Police Department. I was previously assigned to D.A.R.T. Drug Abuse Reduction Task Force for several years prior to being assigned to the DEA. As a TFO with the DEA, my duties include the investigation of violations of federal law concerning the importation, manufacture, possession, and distribution of controlled substances as defined by Title 21, United States Code, Section 841 including controlled substances such as heroin, fentanyl, cocaine, methamphetamine, marijuana, illicitly diverted pharmaceuticals, and other dangerous drugs.

2.     During my current assignment with the DEA, I have specialized in investigations involving narcotics trafficking and numerous criminal offenses, including those involved in the current investigation. I have received specialized training on the subject of narcotics trafficking and money laundering from the DEA and have been personally involved in investigations concerning the possession, manufacture, distribution, and importation of controlled substances, as well as methods used to finance drug transactions. Since that time, I have primarily been assigned investigations dealing with the importation and distribution of illegal drugs, which includes cocaine, "crack" cocaine, heroin, fentanyl, marijuana, methamphetamine, crystal methamphetamine, and 3, 4-methylenedioxy-methamphetamine (otherwise known as MDMA or "Ecstasy"). During those investigations, I have conducted physical surveillance, electronic surveillance, and wire surveillance. I have also arrested numerous individuals for various drug violations and have spoken with numerous drug dealers, gang members, and informants concerning the methods and practices of drug traffickers. These investigations have also included

the unlawful importation, possession with intent to distribute and distribution of illegal substances, the related money laundering instruments, the conducting of monetary transactions involving the proceeds of specified unlawful activities, and conspiracies associated with criminal narcotics offenses. These investigations have resulted in the seizure of narcotics, arrests of suspects, their prosecution, conviction, and the seizure of large amounts of U.S. currency; seizure of real property; and have involved the use of confidential informants; undercover agents; the analysis of pen registers, trap and trace devices, and toll records; physical surveillances and the execution of search warrants and arrest warrants. I have also testified in grand jury proceedings, suppression hearings, jury trials, and have written reports and analyzed documents in the course of investigations.

3. I have learned through training and experience that drug traffickers and their couriers often fly on one-way tickets and usually do not make travel plans much in advance because they get last second information that the narcotics are ready or instructions and they have no idea how long the transaction will take.

4. This Affidavit sets forth the factual basis for the civil forfeiture of certain seized currency and is based on my personal investigation. It does not include all information obtained during this investigation, rather only that believed necessary to provide a legal basis for the civil forfeiture.

5. On February 9, 2023, agents from the DEA Cincinnati RO received information that Montez Walker was traveling from Cincinnati to Los Angeles, on the following suspicious flight itinerary: his airline ticket was purchased the same day as the day of travel; he purchased a one-way ticket; and he was traveling to a known source city/state. A search of Walker's criminal history showed extensive drug-trafficking and other drug-related arrests throughout his adult life.

6.      I responded to the departure gate accompanied by TFO Eli Sautter and TFO

Richard Bernecker to await the departure of Walker's flight to Los Angeles. Once Walker's

ticket was scanned and he was identified, TFO Bernecker and I approached him, identified

ourselves, and asked if we could speak to him. Walker consented. During this encounter, Walker

was standing in the entrance of the jet-way and free to walk away at any time.

7.      Upon request, Walker presented an Ohio driver's license confirming his identity. I

explained to Walker that the other officers and I were part of an interdiction team looking for

large sums of money and/or drugs related to narcotics and/or terrorism. I asked Walker how

much currency, if any, he was traveling with, and Walker replied that he had around eight

thousand. I asked Walker if the other officers and I could search his person, backpack, and

checked bag, and Walker verbally consented to the searches.

8.      I searched Walker's backpack and located several rubber-banded separated stacks

of U.S. currency in pockets of clothing. Again, I asked Walker how much U.S. currency he had,

and Walker replied, "eight." TFO Bernecker repeated the request for permission to search

Walker's locked checked bag, and Walker again consented. When asked if Walker had any

drugs, weapons, or U.S. currency inside his checked bag, Walker did not reply and instead stared

blankly. Upon request, Walker unlocked his checked bag for the officers to search it, and TFO

Bernecker immediately located a large stack of U.S. currency hidden inside a rolled-up

sweatshirt. Walker was asked how much U.S. currency was inside his checked back, to which he

replied, "I'm not sure, maybe thirty." TFO Bernecker found two more large bundles of U.S.

currency hidden in the toe part of a pair of shoes. I asked Walker why he lied about traveling

with only eight thousand dollars, and Walker just stared at me then looked down.

9.      When asked about what he did for work, Walker said that he plans events for a

company called "LOL Entertainment LLC." But Walker could not provide any proof of

3

employment. Upon further questioning, Walker indicated that he had a bank account with Woodforest Bank but stated that it only had a few hundred dollars in it and that none of the currency he was traveling with came from his bank account. When asked if he had filed taxes the previous year, Walker indicated that he had not.

10.    I asked Walker why he was traveling with so much cash and what was his purpose for travel and he stated "to shop and have fun." However, when Walker was asked exactly what he was planning on buying, he stated "I don't really know."

11.    I requested Walker's consent for officers to search of his two (2) cell phones, but he would not provide it. Walker's phones were seized as evidence and a state search warrant later was obtained for them. The search of Walker's phones revealed evidence that Walker was involved in illegal drug activity, including pictures and other items indicative of drug-trafficking.

12.    In total, $43,210.00 in U.S. currency was discovered and seized from Walker. He was the only person present at the time of the seizure other than law enforcement. After its seizure, the currency was examined by a drug-detecting dog, who showed a positive indication for a narcotic odor thereon.

13.    Several factors established probable cause to believe that the currency seized from Walker was proceeds of illegal drug trafficking or intended to be furnished in exchange for illegal drugs, including but not limited to the following:

   a.  Walker's travel to a known source city/state with a large amount of cash on a one-way airline ticket purchased the same day;

   b.  The manner in which the seized currency was packaged and concealed;

   c.  Walker's vague and unsupported explanations for his purpose of travel and employment;

   d.  Walker's inability to explain where the seized funds came from, acknowledgement that it did not come from his bank account, and admission that he only had a few hundred dollars in his bank account and did not file taxes the year prior;

4

e.  Walker's extensive drug-related criminal history;

f.  Evidence on Walker's cell phones indicative of drug trafficking;

g.  The positive alert by a drug-detecting dog on the seized currency.

14.  DEA commenced administrative forfeiture proceedings against the $43,210.00 in U.S. currency. On or about March 6, 2024, Montez Walker filed a claim to the seized currency in the administrative forfeiture proceeding, asserting that he "was heading out for [a] bachelor party, shopping spree and to buy [his] wife a new ring."

15.  Based on the information provided in this Affidavit, affiant believes that the seized currency was furnished or intended to be furnished in exchange for controlled substances, represents proceeds traceable to such an exchange, or was intended to be used to facilitate the illegal sale of narcotics and is, therefore, subject to seizure and forfeiture to the United States of America pursuant to 21 U.S.C. § 881(a)(6).

I declare under penalty of perjury, as provided by federal law, that the foregoing statements are true. Further your affiant sayeth naught on this the 3RD day of June, 2024.

Nicholas Nimeskern, Task Force Officer
Drug Enforcement Administration